# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TERESA GOLDSMITH, | : | Case No. 3:16-cv-00003 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Commissioner of The Social | : | |
| Security Administration, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.     Introduction

Plaintiff Teresa Goldsmith brings this action under 42 U.S.C. § 405(g) for review of the Social Security Administration's final decision denying her application for Disability Insurance Benefits.  She asserted before the Administration that starting on December 30, 2011, she was under a benefits-qualifying disability due to her mental and physical health problems, including paranoid schizophrenia, depression, anxiety, bipolar disorder, carpal tunnel syndrome, osteoarthritis, and back problems.  An Administrative Law Judge (ALJ), Elizabeth A. Motta, denied Plaintiff's application based on the central conclusion that Plaintiff was not under a "disability" as defined in the Social Security Act.  (Doc. #6, *PageID* #s 41-61).

Plaintiff contends here that ALJ Motta erred by (1) rejecting multiple opinions from Plaintiff's treating sources; (2) inadequately explaining the deference she gave to the opinions of non-examining medical sources; and (3) applying disparate scrutiny to the non-examining medical sources' opinions.

## II.  <u>Background</u>

Plaintiff was classified as a "younger individual" under social security law on March 31, 2014 (her "date last insured").  She has a high school education and past relevant work as a dietary aide and a motor vehicle assembler.  *Id.* at 258.

ALJ Motta summarized Plaintiff's hearing testimony as follows:

> The claimant testified that she is 66 inches tall. She weighs 190 pounds.  The claimant lives in a single-family home with her husband.  She last operated a motor vehicle in 2012.  The claimant does not currently have a driver's license.  She alleges disability due to back pain and lower extremity pain.  The claimant had back surgery in 2008.  She also had gastric bypass surgery.  The claimant recently had hand surgery but, according to her testimony, this did not help much.  She has diminished grip strength and reduced manipulative ability.
>
> The claimant does household chores as she is able.  She uses taxi cabs for transportation when necessary (such as to doctor appointments).  The claimant shops occasionally.  She attends church.  She sees her grandchildren about once per month.  The claimant is able to attend to her own personal grooming and hygiene needs.  She is able to use a computer but she does not use one very often because there are too many pop-ups and she is worried they may carry a computer virus.  She watches television.
>
> When questioned by her attorney, the claimant testified that she has memory problems and feelings of paranoia.  She is depressed and she has crying spells.  The claimant is frequently tired and fatigued.  She

2

> experiences insomnia. The claimant takes prescribed psychotropic
> medication for depression and anxiety. The claimant takes
> prescribed psychotropic medication for depression and anxiety. Such
> medication is beneficial.

*Id.* at 44. This last sentence—a generalization—implies Plaintiff experiences more

medication benefits than she described. When asked, "Does the medication help you at

all?" Plaintiff answered, "It keeps me together for most part of the day I guess,

sometimes unless a situation comes up that I can't handle." *Id*. at 86. Plaintiff also

estimated that she spends 95% of her day lying down, sometimes watching TV, other

times listening to the radio. *Id*. at 83. Plaintiff's husband does the laundry and most of

the cooking. *Id*. at 78. She does some light cleaning, but there are days when she just

cannot do it because of her pain. *Id*. Sometimes she goes to the grocery store; she does

not generally go out to eat. *Id*. at 79, 81. When she returns from the store, she feel "very

tired, exhausted" and goes to bed. *Id*. at 84.

Plaintiff's medical records concerning her physical health contain significant

information and opinions from several medical sources. Dr. Marcos E. Amongero

performed back surgery—an L4-5 and L5-S1 discectomy and fusion—on July 9, 2008.

*Id.* at 328-35, 351-54. Yet, the hardware in Plaintiff's low back had failed by August 1,

2008, and Dr. Amongero surgically removed it and "exchanged" it, presumably with

other hardware. *Id.* at 326-27.

Plaintiff began seeing primary care physician Dr. Rhea Rowser in November

2012. Dr. Rowser's diagnostic assessment of Plaintiff included, in part, essential

3

hypertension, benign; obstructive sleep apnea; depressive disorder, not elsewhere classified; anxiety state, unspecified; insomnia, unspecified; and morbid obesity. *Id.* at 485-87.

When seen in December 2012, Plaintiff complained to Dr. Rowser of continued difficulties with sleeping. She reported that she was taking 20 mg of Ambien, even though she knew that this was above the maximum dosage. Plaintiff was also concerned about continued weight gain but states she has not been eating too well. Dr. Rowser prescribed a Nicoderm patch to quit smoking, vitamin D, continued Plaintiff's blood pressure medication and encouraged diet and exercise. *Id.* At 488-89.

In September 2013, Plaintiff complained to Dr. Rowser of upper back pain. She noted she had not been walking due to leg and feet pain. Plaintiff was given medication to stop smoking and a letter for medical necessity for bariatric surgery. *Id.* at 757-58.

By March and April 2014, Plaintiff was experiencing pain in her knees, hands, and back; and numbness in her hands. *Id.* at 749-50, 814. On April 11, 2014, Dr. Rowser completed a Medical Impairment Questionnaire concerning Plaintiff. *Id.* at 798-99. She reported that Plaintiff's symptoms included nerve damage in her hands for which she is followed by Dr. Barre; bilateral knee pain, followed by Dr. Lochner; and back pain with radiation into her right leg related to Plaintiff's 2008 spinal surgery. Dr. Rowser opined that Plaintiff was restricted to standing for no more than thirty minutes at a time and sitting no greater than sixty; lifting to no more than ten pounds occasionally; Plaintiff

4

should never bend or stoop as a part of occupational activity and should balance only occasionally; no hand manipulation; Plaintiff needs the ability to occasionally elevate her legs at or above waist level. Dr. Rowser further opined that Plaintiff has significant problems with anxiety or depression which would markedly limit her ability to withstand the stresses and pressures of ordinary work activity. *Id.* Lastly, Dr. Rowser concluded that Plaintiff has the capacity for only two hours of work activity per day. *Id.* at 798-99.

Turning to non-treating, record-reviewing medical sources, state agency physician Dr. Maria Congbalay reviewed the record and evaluated Plaintiff's physical functioning in March 2013. *Id.* at 124-34. Dr. Congbalay opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday. *Id.* at 129. Plaintiff could, according to Dr. Congbalay, occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl. *Id.* at 129-30. Dr. Congbalay concluded that her assessment of Plaintiff's residual functional capacity, or the most she could do despite her impairments, constituted an adoption of a previous ALJ's decision dated December 29, 2011. *Id.* at 130. In August 2013, Dr. Steve E. McKee reviewed Plaintiff's records and agreed with Dr. Congbalay's opinions. *Id.* at 136-49.

Plaintiff's medical records concerning her mental health contain significant information and opinions from several medical sources. She sought mental health treatment from Dr. Amita Patel in February 2010. Plaintiff reported excessive

5

worry/anxiety, impaired social/occupational functioning, difficulty with interpersonal relationships, restlessness/feeling keyed up, depressed mood, diminished interest in pleasurable activity, fatigue/loss of energy, feelings of worthlessness, poor concentration, lack of self esteem, and excessive inappropriate guilt. *Id*. at 386. On mental status examination, Dr. Amita Patel noted many observations: Plaintiff was easily distracted; she was cooperative; her eye contact was good; her mood was sad and anxious; her affect range was constricted yet her amplitude of affect was normal; she was logical and goal oriented; she had experienced auditory hallucinations; her thought content was paranoid and preoccupied; her judgment was intact; and her insight was fair. Dr. Amita Patel diagnosed Plaintiff with major depression, a schizoaffective disorder, and insomnia. *Id.* at 387.

That same day, Dr. Amita Patel prepared medical functional capacity assessment on behalf of the Ohio Department of Job and Family Services. She opined that Plaintiff was markedly limited in her ability to sustain an ordinary routine without special supervision, to maintain regular attendance, to perform activities within a schedule, to work in proximity to others, to accept instructions and respond appropriately to criticism from a supervisor, and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 539.

In March 2010, Dr. A. Patel completed another form (Physician Certification of Medication Dependency for the Disability Assistance Program) in which she noted,

"Patient chronic mental condition is not good.  [Patient] is going through lots of anxiety, major depression, lack of energy, poor concentration, difficulty making decisions, impairment in social occupational functioning, loss of self esteem." *Id*. at 541-42.

After seeing Plaintiff on May 5, 2010, Dr. A. Patel's checked boxes on a form indicating that Plaintiff was markedly limited in fifteen out of twenty mental work abilities.  Dr. A. Patel also checked boxes opining that Plaintiff was unemployable and would remain so for twelve months or more.  *Id*. at 543.

In January 2011, psychiatrist Dr. Amparo Wee checked boxes on a form indicating that Plaintiff is markedly limited in her ability to accept instructions, her ability to respond appropriately to criticism from supervisors, and her ability to travel in unfamiliar places.  *Id.*  Dr. Wee checked remaining boxes on this form indicating that Plaintiff's mental functioning capabilities were either "not significantly limited" or "moderately" limited.  She concluded that Plaintiff was unemployable and would remain so for twelve months or more.  *Id.* at 545-46.

Dr. Wee saw Plaintiff on January 10, 2012 and noted she reported feeling depressed because she was denied her application for social security benefits.  Dr. Wee continued her medication with no change in diagnosis.  *Id.* at 573-77.

In March 2012, Dr. Wee observed that Plaintiff was well groomed, cooperative with clear speech, but she had a depressed mood and a constricted affect.  Dr. Wee assessed Plaintiff as having schizoaffective disorder.  *Id.* at 578-83.

7

Plaintiff went to the emergency department at Miami Valley Hospital in June 2012 with depression and suicidal ideation. She told physicians that she had a psychiatric history of paranoid schizophrenia and bipolar disorder with depression. *Id*. at 394. She had experienced suicidal ideation for several months and thought about overdosing with pills. A physician noted that Plaintiff said, "The question is not 'if' but 'when' I'll do something. She says just as soon as she's made up her mind to try something, her grandchildren will call and she will feel guilty." *Id*. at 395.

Plaintiff described feeling really down about being unemployed and without a car for two years. She felt trapped at home and was deteriorating. She had been trying to enroll in the Easter Seals Program for disability due to her mental illness for some time, but she had been denied social security since 2008. Her husband of twenty-eight years was employed, and she denied any marital problems. She had been unable to sleep for four nights before going to the hospital. *Id.* at 393-444. She was admitted overnight for monitoring. *Id.* at 393-444. She was discharged the next day. Her discharge diagnosis was "Depression, NOS [not otherwise specified], now resolved ." *Id*. at 393. She instructed to follow up with Dr. Wee. *Id.* at 393.

Dr. Wee saw Plaintiff at the end of June 2012, after her hospitalization. She reported her symptoms as insomnia, depression, auditory hallucinations, impaired judgment, and irrational thoughts. Dr. Wee made sure a safety plan was in place for Plaintiff to use if her symptoms worsened or she needed a medication refill. Plaintiff also

8

met with her counselor that day for an updated diagnostic assessment. The diagnostic impression was a schizoaffective disorder. *Id.* at 584-93.

Plaintiff's medication management was transferred from Dr. Wee to another psychiatrist Dr. Pravesh Patel in August 2012 due to office location. *Id.* at 448. When initially seen by Dr. P. Patel, Plaintiff reported paranoia, mood swings, feelings of worthlessness, and decreased energy. *Id.* On mental status examination, she was found to be anxious. *Id.* Dr. P. Patel adjusted and continued her medication. *Id.* at 448-53. Plaintiff continued to see Dr. P. Patel for medication management through June 2014. *Id.* at 454-77, 516-38, 733-46, 1018-33.

In April 2014, Dr. P. Patel completed a mental impairment questionnaire in which he noted Plaintiff's history of anxiety, mood swings, depression, and paranoia. Examination findings included a constricted/anxious affect and paranoia. *Id.* at 795. He opined that Plaintiff had marked restrictions in seven of twenty-four functional areas, including in her abilities to work in proximity to others without being distracted by them, carry out very detailed instructions, perform activities within a schedule and maintain regular attendance, maintain attention and concentration for extended periods, and interact appropriately with the general public. *Id.* at 796. The remaining areas of her mental functioning were found to be slight or moderate. *Id.* at 796-97. Dr. P. Patel concluded that Plaintiff would be absent from work more than three times each month. *Id.* at 796.

9

In March 2013, after reviewing Plaintiff's medical record on March 26, 2013, psychologist Kristen Haskins assessed her mental condition at the request of the state agency. Dr. Haskins found that Plaintiff was capable of understanding and remembering simple work instructions; she could sustain concentration and persist in simple, unskilled work tasks; and she can interact occasionally in situations that do not require persuasion or frequent contact with the general public. *Id.* at 130-31.

In July 2013, psychologist Katherine Fernandez reviewed Plaintiff's record upon reconsideration and affirmed Dr. Haskins' assessment. *Id.* at 136-47.

## III.   <u>ALJ Motta's Decision</u>

Plaintiff's eligibility for Disability Insurance Benefit turned on whether she was under a disability" as defined by social security law. *See* 42 U.S.C. § 423(d)(1)(A)-(d)(2)(A); *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To resolve this issue, ALJ Motta evaluated the evidence under the Social Security Administration's five-step evaluation procedure. 20 C.F.R. § 404.1520(a)(4). Moving through step one, the ALJ found at steps two and three that Plaintiff's impairments—including her severe impairments of lumbar spine degenerative disc disease, obesity, schizoaffective disorder—did not automatically entitle her to benefits. (Doc. #6, *PageID* #s 45-53). At step four, ALJ Motta found that the most Plaintiff could do despite her impairments—her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was a reduced range of light work including:

10

lifting as much as twenty pounds occasionally and ten pounds
frequently, except: she should have been provided the opportunity to
alternate between sitting and standing as often as ten minutes per
hour.  Postural activities (e.g., climbing ramps or stairs, balancing,
stooping, kneeling, crouching, crawling, or twisting side to side) could
be done no more than occasionally.  The claimant could not climb
ladders, ropes, or scaffolding.  She should not have been exposed to
hazards such as moving or dangerous machinery or working at
unprotected heights.  The claimant should not have been
expected to work on uneven terrain.  She could do no more than
frequent handling and fingering bilaterally.  She could do no more
than performing simple repetitive tasks involving low-stress duties
(i.e., no strict production quotas or fast pace and only routine
work with few changes in work setting).  She could perform duties
involving no more than occasional contact with the general public, co-
workers and supervisors.

*Id*. at 53-54.  Given these abilities and limitations, the ALJ found (also at step four) that

Plaintiff could not perform her past relevant work.

The ALJ next found (step five)—by adding these abilities and limitations to

Plaintiff's younger age, her high-school education, and her work experience—that

Plaintiff could perform a significant number of jobs in the regional and national

economies.  These doable jobs, according to the ALJ, included inspector/hand packager,

laundry worker, and mail clerk, and others.  This step-five finding dictated the ALJ's

final determination that Plaintiff was not under a disability and not eligible for benefits.

*Id*. at 75-76.

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## V.    <u>Discussion</u>

Plaintiff argues that the ALJ erred in rejecting the opinions provided by her

treating medical sources, Dr. Amita Patel, Dr. Wee, Dr. Pravesh Patel, and Dr. Rowser.

She reasons that (1) the ALJ failed to substantiate her justification for the weight she

placed on their opinions, (2) the evidence does not support the ALJ's reasons but instead

supports the medical sources' opinions, and (3) and the ALJ failed to consider the

deferential factors required by regulation and case law.  Plaintiff further contends the ALJ

erred by not adequately explaining her deference to the opinions of record-reviewing

medical sources and by scrutinizing her treating sources' opinions more that the opinions

of the record-reviewers.

The Commissioner counters: (1) the ALJ properly weighed the opinions of

Plaintiff's treating sources, (2) the ALJ provided good reasons for not placing controlling

or deferential weight on their opinions, and (3) specific evidence, which the

Commissioner describes, supported the ALJ's assessments of the weight due each

source's opinions.

The parties' disagreement over the ALJ's evaluation of Plaintiff's treating medical

sources arises from the "greater deference … generally given to the opinions of treating

physicians than to those of non-treating physicians …. " *Rogers,* 486 F.3d at 242

13

(citations omitted).  This greater deference, "commonly known as the treating physician rule," *id*., rests on straightforward criteria:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citations omitted); *see Gentry v. Comm'r of Soc. Sec.*,  741 F.3d 708, 723 (6th Cir. 2014).  If the treating physician's opinion is not controlling, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242 (citation omitted).  As a result, when the treating physician rule does not apply, ALJs must continue to weigh a treating physician's opinion under "a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Id*. (citing *Wilson*, 378 F.3d at 544).  ALJs must likewise consider these regulatory factors when weighing the opinions provided by nontreating phsycians. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-37 (6th Cir. 2016).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions by stating "specific reasons for the weight placed on a treating source's medical opinions …." *Wilson*, 378 F.3d at 544 (quoting

Soc. Sec. R. 96-2p, 1996 WL 374188 at *5 (1996)). The ALJ's reasons must be "supported by the evidence in the case record …." *Id.* The goals are to assist the claimant in understanding the disposition of his or her case and to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.*

In the present case, the ALJ declined to apply controlling or deferential weight, to the opinions provided by Dr. Amita Patel, Dr. Amparo Wee, and Dr. Pravesh Patel. The ALJ found their opinions as to Plaintiff experiencing "marked" limitation "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." *Id.* at 50. The ALJ also found that they based their assessment "on uncritical acceptance of the claimant's subjective complaints." *Id.*

The ALJ set forth the correct legal criteria for weighing opinions from treating medical sources. *See* Doc. #5, *PageID* #s 50-51. The ALJ then found that the opinions of Drs. A. Patel, P. Pate, and Wee concerning Plaintiff's "marked limitations" in her mental work abilities "cannot be given controlling or even deferential weight. The conclusions of these medical sources are neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record. The extent of impairment described by those sources could only be based on uncritical acceptance of the claimant's subjective complaints." *Id.* at 51. Next, the ALJ supported these conclusions by discussing certain evidence . *Id.* And, the

15

ALJ's previous description of these medical sources' opinions bolsters her reasoning. *Id.* at 48-50.  It should be noted in passing, however, that the ALJ's evaluation is not a model of perfection:  She could have more clearly tied together her description of pertinent medical records with her application of the legal criteria applicable to treating source opinions. *Cf. Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) ("[T]he ALJ failed to provide a 'logical bridge between the evidence on the record and his conclusion....' ") (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).  Despite this, the ALJ's decision is sufficiently detailed "to assist the claimant in understanding the disposition of … her case and to make clear to any subsequent reviewer the weight given and the reasons for that weight."  *Wilson*, 378 F.3d at 544 (quoting Soc. Sec. R. 96-2p, 1996 WL 374188 at *5 (1996)).

Beginning with psychiatrist Dr. A. Patel's opinions, in February 2010 opinion (before Plaintiff's alleged disability onset date), Dr. A. Patel had seen Plaintiff once.  She diagnosed Plaintiff with "major depressive disorder recurrent episode," and schizoaffective disorder. *Id.* at 387.  Dr. Patel's estimate of Plaintiff's Global Assessment of Functioning (GAF) placed her in the category of having "[m]ajor impairment in several areas, Some impairment in reality testing." *Id.* at 387.  Yet, just a few months later, in May 2010, Dr. A. Patel reported a GAF score reflecting only mild symptoms.  (PageID 49, 384-85, 387).  Although Dr. A. Patel's GAF assessments taken individually say little about the validity or invalidity of this psychiatrist's opinions, the

significant improvement in her GAF in such a short span of time detracts from Dr. Patel's opinions concerning the severity of Plaintiff's mental work impairments. Indeed, based on that improvement, the ALJ reasonably concluded that Dr. A. Patel's notes were insufficient to support the marked limitations she indicated. *See* 20 C.F.R. § 404.1527(c)(3) ("Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Additionally, social security regulations did not require the ALJ to credit Dr. A. Patel's opinion that Plaintiff was "unemployable," *see id.* at §404.1527(d), particularly where—as the ALJ reasonably recognized—there is no indication in Dr. Patel's report that her generic statement is consistent with the definition of "disability" under social security law. (Doc. #6, *PageID* #50). Moreover, Dr. A. Patel's 2010 opinions predated Plaintiff's alleged onset date (December 30, 2011), and related to a time during which Plaintiff has been previously and finally adjudicated as not disabled. *See id.* at 12-13.

Psychiatrist Dr. Wee saw Plaintiff for medication management beginning sometime in 2011. *See, e.g.,* Doc. #6, *PageID* #s 568-89, 546. Although Dr. Wee completed an assessment regarding Plaintiff's mental functional abilities, there are not treatment records from treatment she had with Dr. Wee during 2011. *Id.* at 545-46. Dr. Wee, moreover, believed that Plaintiff was markedly limited in only three of twenty

17

areas—namely, her abilities to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to travel to unfamiliar places or use public transportation.[1]  And, Dr. Wee noted in 2011 that Plaintiff was "not significantly limited" or no more than "moderately limited" in the remaining seventeen areas.  *Id*. at 545.  Yet, Dr. Wee also checked a box indicating that Plaintiff was "unemployable," an opinion (as with Dr. A. Patel) not binding on the ALJ.  This opinion, moreover, was inconsistent with Dr. Wee's opinions in 2011 concerning Plaintiff's work limitations.

In treatment records from March 2012, Dr. Wee reported that Plaintiff had a depressed mood and constricted affect, she was well-groomed and cooperative; her demeanor and activity were average; her speech was clear; her thought process was logical and she reported no hallucinations.  *Id*. at 578-79.  Dr. Wee diagnosed Plaintiff with a schizoaffective disorder.  *Id*. at 582-83.  In evaluating Dr. Wee's opinion, the ALJ considered the numerous areas in which Dr. Wee opined that Plaintiff either had no significant limitation or no more than moderate limitation undermined a disabling level of impairment.  *Id*. at 48-49.  Moreover, the ALJ generally accounted for Dr. Wee's "marked" limitations by including cognitive, stress, and social limitations (namely, simple, repetitive tasks involving low-stress duties, no strict production quotas or fast

---

[1] The ALJ mentioned that Dr. A. Patel may have previously seen Plaintiff in 1999.  *Id*. at 48; *see PageID* #s 119, 362).  Those records are not in the file.

pace, only routine work with a few changes in work setting, and only occasional contact with supervisors) in her assessment of Plaintiff's residual functional capacity.  *Id*. at 49, 53-54).  The ALJ also considered that at the time of Dr. Wee's assessment, Plaintiff was working as a dietary aide.  *Id*. at 39.  The ALJ reasonably found that Plaintiff's ability to work undermined Dr. Wee's opinion that she was unemployable.

Even if Dr. Wee's opinion concerned Plaintiff's condition in 2011, the ALJ also considered that she did not stop working due to a mental impairment, but rather, because she was faulted for eating ice cream in front of a nursing home resident, in violation of work policy.  *Id*. at 51, 57, 74-75.  Thus, Plaintiff's reasons for not continuing to work were unrelated to her mental condition.  And as with Dr. A. Patel's opinions, Dr. Wee's 2011 opinion predated Plaintiff's alleged onset date of December 30, 2011, and thus related to a time during which Plaintiff had been previously and finally adjudicated as not disabled.

With regards to Dr. P. Patel's opinion, the ALJ considered that the mental status findings in Dr. Patel's treatment records were generally normal.  *Id.* at 49-51.  *See* C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  Substantial evidence supports this.  For instance, when seen in November 2012, Plaintiff's concern was an 11 pounds weight gain over the prior year caused by her medication Geodon.  She was sleeping 6-7 hours per night.  *Id.* at 462.  The following year, when seen in May 2013, Dr. Patel advised Plaintiff "to go for

19

diet and exercise before considering bariatric surgery.  Plaintiff reports she doing pretty well.  She wants to quit smoking and asked to prescribe Wellbutrin to help quit smoking cigarettes.  She denies side effects on Wellbutrin when used it years ago.  She reports stable mood.  Denies feeling depressed nor anxious.  No mood swings/anger.  No AH/VH.  No S/H/I.  No alcohol or illicit substance use.  Compliant on meds and able to tell the names.  Sleep and appetite are normal." *Id.* at 524.  Given such evidence, the ALJ reasonably found that Dr. P. Patel's opinion was not supported by the evidence in the record, including his own treatment notes.  *See* 20 C.F.R. § 404.1527(c)(3)-(4) (medical opinions evaluated for supportability and consistency).

Turning to Dr. Rowser, the ALJ correctly recognized that the extent of impairment described by Dr. Rowser lacks support in the medical record and is without sufficient medically determinable justification.  *Id.*  The ALJ further found that Dr. Rowser's opinion appears to be "based largely on the claimant's subjective complaints."  In light of the substantial evidence the ALJ discussed, *see* Doc. #6, *PageID* #s 49-51, this constituted an adequate reason to discount Dr. Rowser's opinion.  *See Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x. 472, 473 (6th Cir. 2013) ("We have previously found reasoning that a medical opinion relied too heavily on the claimant's subjective complaints as adequate to support an ALJ's decision to give little weight to the opinion.").  Additionally, examination of the evidence confirms the ALJ's assessment of inconsistencies between Dr. Rowser's opinion and other evidence in the record.  For

example, when seen in May 2013, Dr. Rowser reported that Plaintiff's posture was "unremarkable" and her range of motion was "unrestricted." *Id.* at 498. Objective medical evidence includes an MRI of Plaintiff's lumbar spine taken in May 2014, which showed no evidence of significant central spinal canal stenosis or foraminal or lateral recess narrowing in the lumbar spine. *Id.* at 808-09.

Plaintiff points out that Dr. Rowser's opinion is also the only assessment of Plaintiff's physical capabilities prepared by a medical source that had even set eyes upon her and is also the only evaluation in the record to speak to Plaintiff's manipulative limitations. However, as the ALJ correctly recognized, Dr. Rowser's treatment records contained minimal references to back pain or significant spinal impairment. *Id.* at 58 (citing *id*. at 747-93). Even though Dr. Rowser indicated Plaintiff had upper-extremity limitations, the record shows she underwent successful surgery and this limitation did not persist for a continuous twelve-month period. *Id.* at 46 (citing to 1038-40). Given Dr. Rowser's minimal findings and the absence of specific information or an explanation in support of her opinions, it was reasonable for the ALJ to decline to place controlling or deferential weight on Dr. Rowser's assessment.

Plaintiff's further contends that the ALJ improperly relied on the opinions of the record-reviewing psychologists, Dr. Haskins and Dr. Fernandez, and record-reviewing physicians, Drs. Congbalay and McKee, who never examined her and who completed

21

their assessments after reviewing "only a small fraction of the medical record." (Doc #8, PageID# 1063).

Starting with Drs. Haskins and Fernandez's assessments, Plaintiff argues that "ALJ Motta does not actually explain how either an application of the regulatory factors to the record's evidence supports this deference. For instance, while she repeatedly asserts that the mental health opinions of Drs. Haskins and Fernandez "best represent the degree of restriction experienced by the claimant…" she fails to specifically explain the regulatory or evidentiary basis for this conclusion." (Doc. #8, PageID# 1062) (citations omitted). The ALJ, however, properly analyzed Plaintiff's mental impairments under the four criteria of the "B" listings. *See* Doc. #6, PageID #s 51-52. The ALJ noted that the Plaintiff did not stop working because of a mental impairment but because she was discovered eating ice cream in front of a nursing home resident (in violation of work policy). *Id.* at 51. Dr. Haskins and Dr. Fernandez determined that Plaintiff may experience "moderate" limitation in her ability to maintain social functioning. The ALJ reasonably determined that this is also consistent with the conclusions of treating source Dr. P. Patel, (*id*. at 796), and Dr. Wee (*id*. at 545). *Id.* at 51-52. According to Dr. Haskins, Plaintiff's ability to maintain attention and concentration was "moderately" limited but she is not significantly limited in her ability to make simple work-related decisions. *Id.* at 131. According to Dr. Fernandez, Plaintiff was "moderately" limited in her ability to maintain concentration, persistence or pace. *Id.* at 142. Dr. A. Patel

22

indicated that Plaintiff's capacity to maintain attention and concentration is "moderately" limited. *Id.* at 543. The ALJ determined that any greater (than "moderate") degree of limitation is not supported by the evidence of record. *Id.* at 52.

The physical assessment of Plaintiff's physical residual functional capacity completed by Drs. Congbalay and McKee reasonably relied on an absence of objective clinical findings to find that Plaintiff could perform work activities of a light exertional level. *Id.* at 124-34, 136-49. Dr. Congbalay noted that Plaintiff does not have new and material conditions to consider, and the current evidence in file is similar to the evidence in file at the time of the last ALJ decision. *Id.* at 128. Dr. McKee noted that when Plaintiff saw Dr. Amongero in May 2013, her examination showed "no acute distress A&Ox3. Posture unremarkable and antalgic gait Non tender. Neuro Intact to light touch. NO focal motor deficits DTR equal [bilateral] Right and Left straight leg raise negative. able to heel and toe walk. Dx: [status post] L4-5 and L5-1 decompression and instrumented fusion, done in 2008." *Id.* at 141. Although Drs. Congbalay and McKee rendered their opinions before Dr. Rowser issued her opinion, Dr. Rowser's progress notes from 2013 and 2014 do not show any significant changes in Plaintiff's condition to explain the severe limitations imposed by Dr. Rowser's assessment. In view of the conflicting evidence in the record, it was the ALJ's reasonable judgment to place less weight on Dr. Rowser's opinion about Plaintiff's physical residual functional capacity. *See* 20 C.F.R. § 404.1527(c)(3)-(4); 20 C.F.R. § 404.1527(e)(2)(i) (state agency

23

consultants are "highly qualified physicians . . . who are also experts in Social Security disability evaluation."); *see also Vorholt v. Comm'r of Soc. Sec.*, 409 F. App'x 883, 887 (6th Cir. 2011) (holding that the ALJ was justified in relying on the opinion of the state agency physician).

Accordingly, Plaintiff's Statement of Errors lacks merit.

**IT IS THEREFORE ORDERED THAT**:

1.      The ALJ's non-disability decision is affirmed; and

2.      The case is terminated on the Court's docket.


March 27, 2017                              *slo/Sharon L. Ovington*
                                           Sharon L. Ovington
                                           United States Magistrate Judge